Next case is 22-20-25, Celspin Soft v. Fitbit. Mr. Fuller. And can I ask you to address the issue of a final judgment as you begin? I certainly will, Your Honor. Thank you. I will address that issue first. The parties have conferred on this, and I think I have a unified proposition or suggestion to the Court. We would agree that because there were certain counterclaims that were not resolved by the summary judgment motion, namely counterclaims for invalidity that were filed by Fossil Fitbit, I would note also that Garmin had filed a counterclaim for not only invalidity but of ineligibility. As to those three defendants, the final judgment did not resolve all of the causes of action in the District Court. What we would suggest is that the Court follow a practice which does have some precedent, and that is namely to proceed with the oral argument today, dismiss these appeals at least as to those three defendants and remand to the District Court, at which point the parties would resolve whatever remaining counterclaims most likely by a stipulation to dismiss those without prejudice to refiling in the event this Court remands the case back to the District Court, file a new appeal based on the complete final judgment, which would be assigned back to this panel. Why don't we stop the clock because I don't want to use it. I guess I look to my colleagues, but that's not the way we usually do it. My understanding is you all, the parties, would go back to the District Court and ask for 54B or ask for dismissal. We don't have to remand anything to the District Court because it's not a final judgment, so it remains before her and not before us. I don't know if my colleagues have anything to add. I don't remember seeing in the docket sheet on Garmin that there was a counterclaim. Did I just miss that? Sure. Garmin, it was at docket 78 in the District Court. Their answer to the first amendment complaint had counterclaims for ineligibility and invalidity. At least that's what our internal records reflect. I would point out to the court cases such as Enzo Biochem, as well as Part Division B Qualcomm, instances where this court did the procedure which we're suggesting, and that is to, perhaps I said remand, I didn't mean to say remand, I meant to dismiss the counterclaims as to those defendants for lack of jurisdiction, and then when the parties go back to the District Court, stipulate, do whatever entries need to be made into the record there in order to resolve those pending counterclaims, at which point the District Court would enter a new final judgment which would resolve all matters, and then the parties would take an appeal from that, which would be assigned to this panel for rendering a judgment based on today's oral argument and the briefs that are before the court. Okay. Well, I want to hear from my colleagues on how to proceed, but I think you may be wrong about Garmin. Okay. If you look at Appendix 120, there's a 54B, right? Is that the right docket sheet? Appendix 120. I have, this is the court-granted defendant Garmin's motion for summary judgment, entry of judgment. However, because Patent 698 remains asserted in this case, the court revises its final judgment to apply only to the claims. And I'm just, I guess I'm just looking also at page 350 of the appendix. Do you have that? This is real deeply in the weeds, but it's really, really, really important. Sure. That's the docket sheet for Garmin. There's an answer filed on November 15th, 2017. That's docket number 16. Docket sheets say if there's a counterclaim associated with that answer. I don't remember whether the answer is in here. Was that, was there a subsequent answer in counterclaim? There was a first amended complaint as to Garmin. I don't have the docket entry for that. I do know that the docket entry for the first amended answer- That was docket number 47 at March 2nd, 2018. I have a docket number 78. I don't have the actual document in front of me. I just have- I see. That's the answer to the amended complaint with a counterclaim. Got it. Thank you. And that, those counterclaims to my understanding were not only for invalidity, but also for eligibility. Does anyone have any view about how to proceed here along those lines of dismissing it? I think you had it right. Just giving them the opportunity to- I think you had it right. What's odd here is that this argument is going to give you a bunch of information about what we think about the issues currently in front of us. It's an unusual thing to provide that kind of information, which might then have an effect on what you do with the remaining- with the outstanding counterclaims. My understanding of the proposed approach would be, again, in reference to EnzobioChem and in Parker Vision, would be that we would not re-brief the issues as to Fitbit, Garmin, or Fossil on the next appeal. We would stand on the existing briefs and the oral argument that we present today. And so this panel would then prepare its written opinion based on the record that it has before it. The only thing that would happen on the dismissal for these appeals as to those three defendants would be that we would resolve the jurisdictional problem in the district court by resolving the counterclaims, most likely by dismissing them without prejudice, such that the final order would be final and appealable as to those. Would your consent be needed to dismiss the counterclaims without prejudice? I would certainly consent to that. Maybe it depends on what happens in the next 45 minutes here. Certainly, but on the record- Would it be needed under the rules? As for the counterclaims, I don't know that plaintiff's consent would be necessary for a defendant to- Well, I guess we would. We would consent to a stipulation of dismissal without prejudice. Why don't we hear from- Do you have any comments on what we've been discussing here, sir? Yes, Your Honor. We would be amenable to the procedure that plaintiff's counsel identified. However, there's another procedure that might allow us to short-circuit the kind of back-and-forth with the district court. And in particular, there's a case called Synchronos Technologies, in which case, at oral argument, the counsel that was asserting the counterclaims agreed to- And in the oral argument, it was a little imprecise. It was to drop the counterclaims. And assuming that would be without prejudice, we would be willing to state on the record right now for Fitbit, Fossil, and Garmin that we would be willing to dismiss the counterclaims without prejudice if that statement would resolve the jurisdictional issue. I don't know if it's the same case. I was at one once where, actually, the inside counsel from that party was in the audience, and he said, We make it. Well, can I ask you, sir, if you consent to proceeding in that regard? Absolutely. Yes, Your Honor. Thank you both. We'll start the Plot Corny again at 15. Thank you, Your Honor. If it pleases the court, on de novo review, this court should reverse the erroneous grant of summary judgment that was entered by the district court, which is premised largely on- well, premised exclusively on the district court's position that the plaintiff, Selspin, failed to cite to and present sufficient evidence upon which to raise even a single issue of tribal fact as to infringement. We clearly believe that the record reflects, as detailed in our blue brief, that Selspin has presented substantial evidence of infringement above and beyond those opinions of the expert which the district court, again erroneously in our position, consistently and repeatedly- Did you present evidence that showed that the accused systems included a first processor? A first processor, absolutely, Your Honor. The devices themselves are very clearly established in the record, and the evidence, the teardown evidence, for example, of how the processors are existing is all in the record. Now, those evidentiary citations are in the claim charts that are attached to the expert report that is prepared by Mr. Veach as to each defendant, runs through element by element a written description of his opinion. Now, the district court, I believe, the error in the district court was in not correlating the summary opinions that are set forth in the report with the matching background evidence that's in the claim charts that are incorporated by- Can I ask you, I want to make sure we're talking about the same thing. I'm thinking about the right thing, which is this is where the district court cites the fact that your two experts' reports have a total of two paragraphs, 92 and 94. Are we talking about the same thing, the expert report? And then there's an attached source code, which wasn't in the appendix. Is that the same issue you're talking about, the evidence? Which paragraph is Your Honor referring to, paragraph 94? Yes, 92 and 94. Of the expert report? Yes. Are you talking about the Fitbit reports? Oh, actually, I was for the Garmin case, I'm sorry. Were you talking about- I was referring to Fitbit, but I'm glad to pull up the Garmin. Paragraph 92, Your Honor? And 94, that's what my notes say. I don't see paragraph 92 in the appendix. Is that what Your Honor is referring to? Too many appendices. All right, never mind. So what information are you saying, what evidence did the district court improperly disregard? The totality of the evidence. In each written report, as I mentioned, incorporates by reference claim charts. And I'll give the court a prime example of this. Specifically, and I'll refer to the, commonly referred to the Fitbit reports, just for ease of reference. The Fitbit report, at paragraph 111, addresses the issue of establishing a secure paired connection. Now that paragraph incorporates by reference all of the materials and evidence that's cited in the claim charts, which are prepared, again, element by element, on a Q's product basis. Now, if you look at the Fitbit claim chart that is referenced, and this is that appendix, beginning at page 1248 of the appendix. As to this element, establishing a paired Bluetooth connection, Mr. Veach presents multiple sources of evidence. He begins with evidence of typical Bluetooth functionality, as referenced in the Bluetooth specification. He spends a couple of pages citing to that authority. Beyond that, beginning at page 1254, or actually page 1252 of the appendix, he begins to walk through and illustrate, using screenshots of the actual device, in operation, performing pairing. He performs pairing on the accused device. He cites to the user manual, which is also in the appendix, to illustrate how the user manual instructs the user to perform pairing. These screenshots go on for several pages. Again, step-by-step methodical process. He then, beginning at page 1268 and on to 1269, cites to source code, which one example of that source code is on page 1268, and that's source code base number FBSC311. While that specific line of source code is not explained in this chart, it is explained in the body of the report. Specifically, I believe it's at appendix page 520 and 521. Now, beyond the source code, he cites to defendant's own technical documents. Now, what the district court did was it characterized these citations as mere swaths of documents that are untethered to the claim language and cited to the Traxel case as support for basically rejecting out of hand all of it. But as the court will note, these are not swaths of document citations that require the district court to go dig through the record to find something that might possibly be relevant. These citations are to specific pages. In addition, citations to specific page and line of deposition testimony. Now, in parenthetical form, as to each citation, as the court will see on 1268 and on to 1269, each of those references is the pertinence of that disclosure as to this specific limitation, namely Bluetooth pairing, is identified. Most commonly, it's a direct quote from the document itself, which again is the evidence relied upon, the evidence of record that is relied upon by Mr. Avige when he makes his opinion in paragraph 111 that yes, these devices do perform Bluetooth testing. Now, this is just an example. Each element is laid out the exact same way in each report, in each appendix, in each chart for each accused instrumentality. So what Mr. Avige has done is he has undertaken an exhaustive citation to the record, and we would submit to the court that even if the district court was correct, which we don't think it was, that his ultimate opinions were conclusory, there is still more than sufficient evidence in this record based on the screenshots of the devices in operation. Beyond these and other aspects of the claim chart, he actually performed physical testing of the Bluetooth communications to confirm what is happening with the Bluetooth functionality between the devices. Those reports are in this appendix, as well as Wi-Fi sniffing testing to determine certain elements, specifically how the HTTP communication protocol is implemented by the accused instrumentalities. So the notion that plaintiff doesn't have evidence of infringement cannot possibly stand. This record illustrates the fact that plaintiff has multiple sources, very specific citations to the record evidence of each and every element. In addition to the explanations and the very thorough opinion testimony of its expert, which hasn't been challenged or excluded by Daubert or anything else. So the fundamental basis of the... Can I ask, this is I guess about one of the issues that maybe might fairly be described as not so much an evidentiary issue as a lateness of assertion issue. This is the user identifier issue, and the district court's lateness of assertion basis for saying you cannot rely on the O-off, is that how you pronounce it? O-off, yes. The O-off element because you failed to disclose it in a timely fashion. First of all, do you agree that the propriety or impropriety of that basis is the same for all three patents? I don't remember seeing any distinction being made. No, there's no distinction. As to this question, we completely disagree, obviously, with the district court's position that O-off, standing alone, was a new theory of infringement. It's clearly not a new theory of infringement. From the beginning of this case, in the original infringement contentions and even standing here today, plainest contention as to what the user identifier is as defined in the contentions was that, and I want to be sure I get the language exactly, a username or email address or information based off of a user or the user's associated wearable device. That's what the user identifier is as implemented in the source code. Except for the email. Email address is a very concrete thing. It is. I forget what the second thing you said was. Username or email address. Okay, but the rest is just different words for, it has to identify the user. The problem, I think, that the district court found was that you stopped relying on the email address and you now said, here is a very specific item in several of the defendant's codes, right? Fitbit, Fossil, Garmin, right? Yes, those are, right? And that's what it means. What it means to identify the thing in the code is to say this specific element, not something that serves this purpose. We're not going to yet tell you what it is. And you didn't identify that in an infringement contention. Your expert in deposition, I think, started talking about it, but you didn't amend the contentions. Do I have the picture wrong? Well, the picture is this, is that we could not identify how these defendants implemented in their source code the user identifier until the expert reviewed the source code and was able to identify the specific application. But even after that, you didn't amend your infringement contentions. The source code was reviewed extremely late in the discovery, and I think the timeline is laid out in our petition. There was roughly a month between when the source code was produced and the time when the report was written. So as far as timeliness, we certainly identified the OAuth token or the OAuth credential specifically for these devices as soon as we became aware of it. Now, again, we would go back to the point that the original contention, the sufficiency of which was never challenged by any defendant, and while it may be characterized as loose language, nevertheless, the assertion on the part of plaintiff from the beginning of the case is that a user identifier, as Your Honor pointed out, is self-defining. It's something in the code that identifies the user. And so while we use language as information based off of the user or the user's device, certainly under the local patent rule, that was sufficient. Again, it was never challenged as being insufficient to put the defendants on notice as to what plaintiff's contention was. Then when we get the source code, we see what the specific applications were, and that is presented actually in our reply brief. We lay out those three portions of the source code. Your argument is that the expert clarified the contention. He clarified the contention by identifying the specific implementation. They all do it different ways. Wouldn't you agree that if the clarification was such that you have a whole new... You don't have a clarification. You have a brand-new contention, that that should have been... You should have amended immediately your contentions following the court? Which was done within a month's time after the source code was reviewed, and again, I think that timeline is laid out in our brief. As to your point, it's not a new theory. It is an application of the existing theory, and again, each defendant implements the user ID in different ways. The Fitbit source code, for example, identifies the OAuth credential as the user identifier. Whether it's an OAuth token, which I believe is used by Fossil, or some other application, which Garmin uses a different vernacular, each coder has a different approach, but they all perform the exact same thing, and that is they identify the user based off of user identification or some information based off of the user's device. So OAuth is, again, not a theory. It is a coding convention used to carry out this very normal routine. I believe I'm over my time. Okay. Why don't we hear from the other side while we short a few minutes of remodel. Good morning. Good morning, Your Honors. May it please the Court. Kareem Usaiah for Fitbit, Fossil, Garmin, and Nike. And I'll start exactly where we left off with the user information or user identifier. Are you here for Under Armour? I believe counsel for Nikon is going to also work with you. Where's Nikon and Under Armour? Under Armour. Sorry. Yes, Your Honor. And we lined it up based on the particular issues. Now, on user information, the issue here is exactly what we were just discussing, which is information about a user does not disclose any information to the defendants about what user information. Can you talk about the specifics of the timing question, I guess, and just clarify that. My recollection is that OAuth was identified by plaintiff's expert in a deposition, maybe in a report, I don't know, but at least a deposition. But at least in my memory, the summary judgment process, it wasn't just like a few weeks before. Yes, that's right. Can you clarify the timing? So during discovery, there was no identification of any OAuth theory. Then in the opening expert report, there is the word OAuth appears, but it's not clear what it's being used for, even that as a particular element. For example, on Appendix 515, there's a mention of OAuth, but without any clarification as to whether it's user identifier or not. And then only in the expert deposition at Appendix 9667 through 68, and the deposition page numbers is 22417 to 2263, was there a clarification that the expert is affirmatively abandoning the original user name or email theory and going to this new OAuth theory. And can you just remind me, what are the dates of these things? What was the date of the expert report? The date of the expert report, we could find that at 515. September 3rd, 2021. Yes, Your Honor, that sounds right. And so that's, what, five months or something before the summary judgment motions were filed? Yes, that's right, Your Honor. It was sometime between the summary judgment argument. However, by that time, fact discovery had closed, and defendants had spent all of discovery researching user names and email addresses and confirming that there's no attachment of that information as required under the claims. And so at that point in time, you know, defendants did not have a fair opportunity to address this new theory. Now, can I stress this? I think in the reply brief, but again, I think not before, either in the district court or in the blue brief here, there's an argument from the other side on this that there's just no prejudice at all for this. Can you address that either as to forfeiture or why there might be prejudice? Yes, Your Honor. There's certainly prejudice here because we lined up the key witnesses and lined up what our experts would say based off of a user name or based off of an email theory. And so when it became clear in expert depositions, after the expert reports had been served and after the close of fact discovery, Fitbit and the other defendants didn't have a fair opportunity to defend themselves against this new OAuth. Can you give a hint about what you might have said had you had that opportunity? I took no prejudice to say it's absolutely clear that the OAuth token or the OAuth meets this claim element. There would have been nothing you could possibly say. What might you have said? For example, OAuth is named Auth because it's about authentication. So we would have found the folks at the defendants who know about authentication, not user names or email addresses and that kind of thing. And so we would have had the folks about authentication to be able to explore the idea that there's some kind of attachments or applying that kind of user information on an intermediary device. We did not have that opportunity. Am I remembering correctly? I just don't want to go off in the wrong direction that there was not, in fact, an argument from Selspin in opposition to this point you made in your summary judgment motion, not an opposition on the ground that there's no prejudice. Even if it was late, there's no prejudice. I'm sorry, Your Honor. I didn't understand the question exactly. In opposition to your summary judgment motion on this point, the other side said this really wasn't late. I don't remember if Selspin said, and even if it was late, you should excuse the lateness because there's no prejudice. I don't remember such an argument, Your Honor. And I think this goes to the abuse of discretion standard. The district court is uniquely situated to evaluate how the litigants were affected by such a change in theory. And the district court was well within its broad discretion to say, here it was late and it did impact the case. And I think that's why Selspin doesn't cite any case where this court has second-guessed the district court's application of its own local patent rules. And there is, if there were any question, there is prejudice here. In fact, Selspin, in its briefing before this court, has admitted that there are all kinds of authentication protocols and ways you could do it in their blue brief at 41 to 42. So right now, they imply that, well, it's obvious that we could have done OAuth and done that particular token functionality. But in their briefing, they say there's many authentication protocols and there's no way we could have predicted that OAuth would be the authentication protocol as opposed to any other of the interchangeable protocols that they cite. And furthermore, I would say that user information doesn't have to be authentication. You could think of many different ways. Maybe it's a social security number. Maybe it's any other way that you identify a user. And being able to try to predict that is simply not something that makes sense in the case. Can I switch you kind of to the first thing that Selspin's counsel was talking about? Yes, Your Honor. Particular example or examples. This is now the evidentiary point, not the OAuth. Yes, Your Honor. Likeness of assertion point. Can you walk through what's your answer to that? Why is the kind of thing or even actually a very specific thing, which I think was maybe focused on the pairing issue from paragraph 111 of the GARLIC report. GARLIC? Yes, I think it's GARLIC. Yes, Your Honor. And just walk through why you think that what he said was sufficient isn't. Yes, Your Honor. So the question the court asked counsel for Selspin was about the first processor limitation. And that is critical because according to the claims, the first processor needs to be configured to do three different things. It must be configured to acquire new data. It must be configured to store the acquired new data. And it must be configured to send an event notification. That's what the first processor needs to do. So what counsel for Selspin did is say, well, we have evidence of some kind of pairing. But that's not responsive to the fact that you need to show and identify a first processor that does all of these things. So even if Selspin has evidence that, you know, they think these steps are done, and even if they have evidence that there exists a processor on the device, that is not evidence that there's a first processor that's configured to do each of these steps. And these steps are not about Bluetooth pairing, which is the evidence that counsel for Selspin was citing. And what's more, and this is pretty critical too, is that the existence of multiple processors was undisputed in the record below. Using the 56, Rule 56, where we propounded certain undisputed facts, we said there's multiple processors in the court below. And in response, at Appendix 15677, Selspin said, undisputed, there's multiple processors. And what that means is there's no evidence that a first processor, as opposed to any of the other multiple processors, does the three things that they need to be configured to do under the claim language. There's a whole other problem about first processor two, which is what... Well, I guess I wasn't entirely sure whether Mr. Filling was talking about the first processor limitation or the paired connection. Paragraph 111 seems to be about the paired limitation. So what about that one? Okay. Yes, Your Honor. So if we look at... I think it's helpful to look at what's actually happening on the device. And if we look at the red brief on page 41, we see a dialogue box. A red brief? Oh, I'm sorry. There might be more than one. We've never had so many red briefs. Sorry. The Fitbit red brief. What page? 41, you said? And what we see here is a dialogue box on page 41. And this is, you know, you can tell it's kind of on an iPhone. And what this dialogue box is doing is it's asking the user, do you want to have a paired connection or do you want a connection that's not paired? And so that's what the user gets to select to do. They're the ones who decide, do you have a paired connection? And all the claims require establishing a paired connection. So it's the user who does that. And even if they click no, you still have a connection that's just an unpaired connection. And what our expert showed, and this is unrebutted, is that if you press cancel, you have an unpaired connection and the device still functions as you may to do all kinds of fitness tracking and all kinds of behavior you might want to do. So why is that important? That's important because no one entity is doing all the method steps. And so there's no one doing all of them. And under the Akamai test, there can be no attributed performance of any step. Because regardless of what the user does, there's no benefit or participation that's conditioned. Regardless, you can use your device as you will. What good is the connection then? So it's an unpaired connection, and it seems a little bit counterintuitive, but basically you can imagine when you're calling someone on your phone, you don't have to have them in your address book to be able to call them. You can just punch in the number and call them, and that's the same principle as Bluetooth pairing. You can either have information about the other party and kind of pair yourself together, or you can just talk even if there's no paired connection. And that's what our expert discusses at length at Appendix 10641-43 and also 10753-56. And this is not a battle of the experts because their expert did not test this functionality. He never clicked on cancel. He never saw the unpaired connection, and that's what the district court found at Appendix 46 in citing the deposition testimony of their expert. Was there ever any teardown of the accused products? No, Your Honor. What happened, and this is relevant to the first processor, what happened is CellSpin used teardowns that they found on the Internet, but they were for the wrong product. They were actually for something called the Fitbit Blaze and Surge, not the devices at issue, which were the Versa 2 and the Charge 3. And you can see that in their own contentions. For example, at Appendix 2002, it says right under it Blaze or Surge. So the pictures they're showing are pictures for the wrong device. So that's a whole other reason, and CellSpin does not even in their reply brief address the first processor argument at all. So all the evidence about there's no first processor that does all these three functions or that they used the wrong processor is completely conceded because they don't address it in their reply brief. So with that, I'll rest on the briefs. Thank you very much, Your Honor. Thank you. Mr. Lloyd, you've got a few minutes. We've got another. I'm sorry. Are we about to hear more about pairing? You can if you need to. Seth Lloyd for Nikon, which has overlapping issues with Under Armour. For both Nikon and Under Armour, the district court's unchallenged claim constructions are dispositive. The district court held that the claims require using a single, continuously maintained connection to perform all claim steps or recited functions, but unrebutted evidence shows that both Nikon's and Under Armour's products do not operate that way. On appeal, CellSpin does not point to any evidence disputing how these products operate. Instead, it conflates the requirement that the connection be between paired devices with the requirement that the connection be established and maintained continuously. But that contradicts the district court's constructions and wrongly seeks to capture claim scope that CellSpin disclaimed during prosecution. During prosecution, CellSpin initially had claims that recited establishing a pairing, and those claims were rejected over prior art that used Bluetooth connections to transfer data. CellSpin amended its claims, changed establishing a pairing to establishing a paired connection, and then repeatedly distinguished its claims over the prior art, based not on the paired aspect of the claims, but on the connection, stating that the key to its invention would be having an ongoing, a constant, or a continuous connection. The district court found that that was a disclaimer of devices that operate by transmitting Bluetooth data when it's available, but then disconnecting the Bluetooth connection to conserve power. But that, again, is the unrebutted evidence, is that's how both Nikon's and Under Armour's products operate. CellSpin's only argument otherwise is based on pairing, which is not, which is a requirement of the claim, but there are other requirements. I'm happy to answer any questions the court has about that. There are also other... If you have a connection between two devices, and then one of the devices goes to sleep, do you still have a continuous connection? Yeah, so I'm not, I'm actually not sure of the answer to that, Judge Rayna. I mean, I think the way CellSpin has pitted the case is that as long as the devices are paired, that's enough. So under CellSpin's theory, one of the devices could even be turned off, or it could be thousands of miles away. And CellSpin would say there's still a connection because they're paired, but that is the understanding of the claims that it disclaimed during prosecution. And I think that's all that the court needs to decide to resolve this case, that that is not enough because that's the only thing that CellSpin argues for these parties. Unless there are further questions, we'd ask that you affirm. Thank you. Okay, Mr. Fuller. We'll give you four minutes if you need it because we want to move ahead of time. Thank you, Your Honor. I want to start where my friend just left off with regard to Nikon. These aren't CellSpin theories. These are just what the claim requires, and this is what the court's claim construction requires. The claims require a secure paired Bluetooth connection. The court construed these terms. There was not a disclaimer argument during claim construction. I think he said there was a disclaimer, and it wasn't in prosecution history. In the prosecution history. I misunderstand that. He was referring to a purported disclaimer during prosecution history. What my point is is that that argument wasn't part of claim construction, and the claims were construed such that a paired Bluetooth connection that's maintained on a continuous basis is one which has an exchange of keys. We have submitted ample evidence of the fact that, with regard to Nikon and the others, that keys are exchanged, and whether or not one device goes to sleep doesn't somehow eliminate the existing pairing. When that device is brought back into range, they automatically communicate with one another. That's because the keys remained exchanged the entire time. I'm sorry. You think that there is a connection at a moment when the devices are too far apart for there to be actually communication between them? Is that what you just said? Yes, based on the court's claim construction of what Bluetooth paired connection is. Absolutely. And, again, because of the fact that the keys are exchanged in the beginning and they remain exchanged, the only way to unpair those Bluetooth devices is to manually go in and select unpair. I want to unpair these devices. I want to get rid of these keys that have been exchanged. Otherwise, the keys remain exchanged. The devices remain in a paired Bluetooth state, regardless of their proximity to one another. I also want to address briefly the user identifier question that has been a main topic. I want to just point out the fact that the claims require a user identifier, not just any user identifier, a very specific user identifier. If I look at claim one of the 752 patent, for example, the Bluetooth-enabled mobile device is configured to attach a user identifier, an action setting, and a destination web address to the obtained new data, wherein the user identifier uniquely identifies a particular user of Internet service provided. It goes on to say that the obtained new data with the attached user identifier is what is sent to the web service. This user identifier isn't something that just floats around in the code. It has a very specific application. It is very specific to this claim. It is attached to the new data and sent. This idea that we didn't know OAuth was part of the case, they know how they implement the user identifier. We didn't until we saw the source code. The idea that they limited their investigation to username or password, when the original contention was clearly not limited to username or password, but also to information based off of the user, in light of the context of the claim, I can't speak for the defendants, but it seems that they self-inflicted wound on that if they limited their investigation to only username and identifier. It sounds like you're arguing that the other side should have proved your case. Not that the other side should have proved our case? Your case. How so, Your Honor? Well, I mean, the authorization, the OAuthO function, how do they know what you're thinking about the OAuthO and how that's going to operate and what is infringement? Just a while back they were arguing that there's many ways in which you can authenticate and you're making it their job to figure out the one way that applies to this case. Not so. Their job is to understand how their own code implements the user identifier that is attached to the new data that is sent to the web service. Our job is to look at the source code and identify specifically how do they do that. They do that by various means, including an OAuth code. You did do that? We did do that. Our expert identified it very easily from the source code. Identified it. It's in his report. It's cited in the claim chart as satisfying the user identifier because it is information based off of a user that is attached in a way that the claim requires. Again, the notion that it is a different theory is incorrect. It is the specific application on a defendant-by-defendant basis of what the user identifier is. The expert pulled it out of the code. We disclosed it. That's what's going to get presented to the jury is OAuth token, OAuth code, user identifier on a defendant-by-defendant basis as meets the limitation of the claim. I believe I'm out of time. Thank you. We thank all parties. The case is submitted.